UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| KAREN L. TAYLOR, | ) | |
| ADMINISTRATRIX | ) | |
| | ) | |
| v. | ) | NO. 2:04-CV-128 |
| | ) | |
| UNITED STATES OF AMERICA[1] | ) | |

## MEMORANDUM OPINION

This medical malpractice action was brought by Karen L. Taylor

("plaintiff" or "Mrs. Taylor"), the surviving spouse of Richard C. Taylor ("Taylor"),

alleging that a physician employed by Rural Health Services Consortium, Inc.,

("RHSC") which is operated through the Public Health Service, was negligent in

failing to timely diagnose and treat the cancer of Taylor, which ultimately resulted in

his death. Jurisdiction over this action is pursuant to the Federal Torts Claim Act, 28

U.S.C. §§ 1346(b) and 2675.

This Court previously granted the defendant's motion for summary

judgment on plaintiff's wrongful death claim, and the case proceeded to trial on the

remaining issue of whether a breach of the standard of care by delay in diagnosis

---

[1] This case was originally filed by Karen L. Taylor, as surviving spouse, next of kin, and
administratrix of her husband, Richard C. Taylor, Richard J. Taylor and Lisa Taylor Smith, individually,
against the United States, Paul Niner, M.D. and Rural Health Services Consortium, Inc. By agreed order,
the claims against Dr. Niner and Rural Health Services Consortium, Inc. were dismissed. This Court
subsequently dismissed the individual claims of Karen L. Taylor, Richard J. Taylor and Lisa Taylor
Smith. The action was prosecuted by Karen L. Taylor in her capacity as administratrix of her husband's
estate.

proximately caused pain and suffering of a greater nature than that which the decedent would have otherwise endured. Because plaintiff failed to prove an essential element of her cause of action by a preponderance of the evidence, plaintiff's complaint will be DISMISSED and judgment will be entered in favor of the government.

**Findings of Fact**

Plaintiff is the surviving spouse of Taylor. Plaintiff and Taylor were married in December, 1967, and Taylor died on April 26, 2002. In addition to his spouse, Taylor was survived by two adult children.[2] Taylor was 53 years of age at the time of his death.

In the fall of 2000, Taylor began experiencing pain in his right arm and shoulder and lower back while playing ball with his grandchildren. His wife, the plaintiff, made an appointment for Taylor at the Limestone Medical Clinic ("LMC"), a clinic operated by RHSC. Taylor saw Dr. Paul Niner, a staff physician at LMC, on September 5, 2000. Mrs. Taylor testified that she had observed a knot on her husband's right shoulder about the size of a quarter raised approximately one eighth of an inch at the time. No mention of any knot or lump appears in Dr. Niner's record of the September 5, 2000 visit. Mrs. Taylor also testified that Dr. Niner's

---

[2] Richard J. Taylor and Lisa Taylor Smith.

examination of her husband on September 5 was cursory.[3]  Dr. Niner felt of Taylor's shoulder in the area of the described  knot through Taylor's clothing.  Dr. Niner diagnosed Taylor with arthralgias, bronchitis, anxiety, and prescribed several medications for the pain and bronchitis and some "nerve pills."  He also ordered "house labs," which required that blood  be collected  before Taylor left the clinic.  It is undisputed that the lab work was not done.  However, some  months later the lab work  was  finally  performed  and  came  back  normal  except  for  some  elevated triglycerides.  At the time of his first  presentation at LMC, it is undisputed that Taylor was already suffering from incurable, undiagnosed  metastatic renal cell carcinoma.

Taylor did not seek additional medical treatment until February 14, 2001, when he returned to LMC to see Dr. Niner.  Mrs. Taylor testified that between the September appointment and February 14, 2001, Taylor continued taking the medication provided by Dr. Niner, believing his problem would go away, but instead the knot doubled in size, and she contends that by February it had grown to the size of a golf  ball.  Plaintiff described her husband's pain between September and February as excruciating.  Pharmacy records reflect that Taylor did not have the

      [3]  Dr. Niner disputes that Mrs. Taylor accompanied her husband on the first appointment and testified that Taylor came in by himself.

prescriptions written in September refilled prior to his visit in February, 2001.[4] As more fully discussed below the Court finds Mrs. Taylor's testimony in this regard not fully credible.

At the time Taylor was seen again by Dr. Niner on February 14, 2001, Dr. Niner assessed Taylor as suffering from shoulder pain, supraspinatus tendonitis, left leg pain, and anxiety/depression, and prescribed medications to treat his pain.[5] Taylor again presented himself to Dr. Niner on March 2, 2001, at which time Dr. Niner ordered an x-ray of Tayor's right shoulder. The x-ray report revealed only degenerative changes, consistent with the prior diagnosis of tendonitis/arthritis. Dr. Niner prescribed various pain medications and muscle relaxants, including Diazepam, carisoprodol, hydrocodone and aspirin.

On April 24, 2001, Taylor called LMC, reporting that he was very ill. He informed an after-hours call center that he had missed an appointment on April 13th and had rescheduled for April 30, but wanted an earlier appointment because he was experiencing pain in his back and legs and could not sit. Taylor was instructed to call LMC during business hours; however, Taylor was not seen again by Dr. Niner

---

[4] Pharmacy records introduced at trial show that Taylor received a 15 day supply of Cimetidine (generally prescribed for hyperacidity), a 30 day supply of aspirin, 325 mg., a 30 day supply of Carisoprodol (a muscle relaxant), a 20 day supply of hydroxyzine (for treatment of anxiety) and a 10 day supply of Cephalexin (an antibiotic), on September 5, 2000.

[5] Vioxx, 25 mg., Diazepam 5 mg., Effexor XR 75 mg., Hydrocodone and Carisoprodol were prescribed.

until April 30, 2001. In addition to other testing and treatment, Dr. Niner prescribed an additional narcotic pain medication, Vicoprofin.

During a follow-up visit on May 14, 2001, Taylor reported back pain of nine on a scale of one to ten, tailbone pain, sacral pain and severe sciatica. Dr. Niner ordered an MRI at Laughlin Memorial Hospital ("LMH") and instructed Taylor to follow-up at LMC after the MRI study. Plaintiff described the knot on Taylor's shoulder during this visit as being abhorrent looking, grotesque and horribly red and swollen down his arm. The MRI was performed on May 15, 2001. The radiology report stated as conclusions:

> 1. MR IMAGING OF THE LUMBAR SPINE DEMONSTRATES NO EVIDENCE OF HERNIATED NUCLEUS PULPOSUS OR SPINAL STENOSIS.
>
> 2. DESTRUCTIVE EXPANSILE MASS-LIKE LESION INVOLVING THE MID SACRUM. NEOPLASM IS STRONGLY SUSPECTED. BONE SCINTIGRAPHY AS WELL AS MR IMAGING OF THE SACRUM AND PELVIS WOULD BE USEFUL IN FURTHER EVALUATION IF CLINICALLY INDICATED.

On June 2, 2001, before the next scheduled appointment with Dr. Niner, the plaintiff and her husband went to the LMH emergency department. Taylor reported having had back pain for two weeks, sacrum pain for two months and severe pain that day that had "gotten a lot worse" that night. The emergency department physician reviewed the MRI report and advised Taylor of his cancer.

Taylor was seen by Dr. Richard Aasheim on June 3, 2001. Dr. Aasheim scheduled follow up testing of Taylor, including a CT of the abdomen and pelvis, for June 8 at Takoma Adventist Hospital, and referred Taylor to a general surgeon, Dr. Robert Weingart. Taylor's scheduled appointment with Dr. Weingart was on June 14, 2001; nevertheless, Taylor once again presented himself at LMC on June 6, 2001, but this time to Mr. Naseri ("Naseri"), the nurse practitioner at LMC. During this visit, Naseri reviewed the MRI study and made note of the cancer diagnosis. Naseri confronted Dr. Niner with the MRI study, and Dr. Niner admitted that he had only made a cursory review of the MRI study and had failed to note that it was indicative of cancer. On June 15, 2001, a biopsy of the sacral mass definitively established the diagnosis of renal cell carcinoma.

On June 14, 2001, Taylor was admitted to the Johnson City Medical Center ("JCMC") for the purpose of pain management and for a diagnostic biopsy. At the time of his admission to the JCMC, Taylor had recently been prescribed a number of pain medications including Lortab and Vioxx (on June 2 at LMH), Percocet (on June 6 by Naseri at LMC) and Vicoprofin (on June 12 by Dr. Aasheim). Taylor was also prescribed oral morphine and MS Contin at JCMC. Additionally, on June 20, 2001, Taylor began receiving palliative x-ray therapy. Following the diagnosis of Taylor's incurable cancer, Taylor's medical care focused solely on pain

management or palliative care.

On July 1, 2001, Taylor was admitted to the JCMC in what he described as the "worst pain" of his life. Attempts were made during this hospitalization to maximize his pain management, and upon discharge on July 2, Taylor was given several more prescriptions including MS Contin, MSIR, Percocet, and Valium. Even so, Taylor was admitted again to LMH four days later on July 6, with continuing severe back pain. At this point, Dr. John Boys, a radiation oncologist, was consulted for treatment of Taylor. During his hospitalization at LMH, Taylor was given a Duragesic patch to help with pain and prescribed Dilaudid, as well as other pain medications.

On August 15, 2001, Taylor was seen by Dr. Anand Karnad, an oncologist with whom Taylor had consulted in June by referral from Dr. Weingart for persistent pain following complications in his palliative radiation therapy. Dr. Karnad indicated that he would communicate with Dr. Aasheim about pain management and that Taylor had reluctantly agreed to further palliative radiation therapy, provided it could be done in Greeneville. On August 28, 2001, Dr. Aasheim found that Taylor was not having good success with pain control, and prescribed additional pain medication including a Nubain 10 and Phenergan 50 injection, Darvocet N-100, and Duragesic patches with an increased dosage of 75 mg. every 48 hours. Despite the

substantial medications prescribed for Taylor in the first three months after his diagnosis, Taylor did not receive effective pain control.

Even after completing x-ray therapy under Dr. Boys' supervision, Taylor reported on January 18, 2002, that he was still in substantial pain. On February 6, 2002, Taylor reported to Dr. A.K. Sen, a medical oncologist, that he was in substantial, intractable pain. Taylor returned to Dr. Boys on February 26, 2002, reporting constant severe pain and that he could barely walk. Dr. Boys gave additional radiation treatments. Nevertheless, Taylor continued to complain of severe pain.

Both Dr. Boys and Dr. Dube, plaintiff's expert medical witnesses, agreed that renal cell carcinoma is very difficult to diagnose and cannot be diagnosed by blood testing. A urine test will sometimes lead to a diagnosis of renal cell carcinoma, but the urine test performed on Taylor in June 2001 was within normal limits. Despite Dr. Niner not knowing of the cancer diagnosis prior to June 6, 2001, no witness testified that the pain medications prescribed by Dr. Niner were a deviation from the standard of care; rather, the medications prescribed were consistent with those prescribed by other physicians who were aware of the cancer diagnosis. In particular, care provided by Dr. Aasheim involved the prescription of similar medications to those prescribed by Dr. Niner.

## Discussion

This medical malpractice case under the Federal Tort Claims Act is governed by the substantive law of the State of Tennessee. *Tennessee Code Annotated* § 29-26-115 requires that a plaintiff prove by expert testimony the recognized standard of acceptable professional practice in the community in which the defendant practices or in a similar community, that the defendant deviated from that recognized standard of acceptable practice, and that as a proximate result of the defendant's negligent act or omission, the plaintiff suffered an injury which would not otherwise have occurred.

The plaintiff asserts that Dr. Niner's treatment of Taylor deviated from the recognized standard of practice at the time of the first visit by Taylor to LMC on September 5, 2000, and at all subsequent visits, by his failure to do an adequate physical examination, to obtain the necessary lab work and diagnostic testing, to diagnose the existing cancer, to document and communicate all relevant findings and diagnoses, to properly treat, and to refer Taylor to an appropriate specialist. The government appears to concede that Dr. Niner's failure to properly chart certain information, his failure to obtain the lab work requested on September 5, 2000, and his failure to recognize the seriousness of the conclusions in the MRI report and to immediately act upon these conclusions, constitute a failure on the part of Dr. Niner

to act with ordinary and reasonable care in accord with the applicable standard. All other alleged deviations from the applicable standard of care, especially as relates to the visit on September 5, are hotly contested. The government further argues that even if it is shown that Dr. Niner breached a duty of care owed to plaintiff, plaintiff has not established the necessary causal link between Dr. Niner's conduct and plaintiff's injury. For the reasons stated more fully below, this Court agrees with the government that plaintiff has not established causation within a reasonable degree of medical certainty.

The plaintiff relies on her expert witness, Dr. Michael Dube, to establish deviations from the standard of care. As an initial matter, however, Dr. Dube's testimony is likely not competent testimony on the issue because he never testified that he was familiar with the recognized standard of care in the community in which Dr. Niner was practicing, *i.e.* Limestone, Tennessee, or in a similar community at the time the alleged injury to Taylor occurred. Tennessee law requires the plaintiff to establish, by competent expert witness testimony, the local standard of care and the expert witness' personal knowledge of the community's standard of care. It is not sufficient that the expert simply state that he is familiar with the applicable standard of care. He must present facts demonstrating how he has knowledge of the applicable standard of care in the community in which the defendant health care provider

practices or in a similar community.  *Kenyon v. Handal*, 122 S.W.3d 743, 762 (Tenn. Ct. App. 2003).

Dr. Dube's testimony establishes that he was practicing general medicine and operating two urgent care walk-in clinics in Johnson City, Tennessee, a neighboring community more urban in nature and more heavily populated than Limestone, but located in the same county.  Dr. Dube practiced general medicine in Johnson City from 2000-2003.  While this may circumstantially prove Dr. Dube's familiarity with the standard of care in Johnson City,  Dr. Dube never affirmatively testified that he was familiar with the standard of care in Johnson City or that Johnson City's standard of care was similar to that applicable in the smaller, more rural community of Limestone.   The failure of Dr. Dube to testify specifically that he was familiar with the standard of care is potentially fatal to consideration of his testimony that Dr. Niner deviated from the standard of care.  Because the competency of Dr. Dube's testimony is inconsequential to the outcome of this case, however, the Court will presume that Dr. Dube was competent to testify as to violations of the standard of care.

Likewise, because of the Court's finding that plaintiff has failed to establish the required causal connection between any alleged breach of the local standard of care by Dr. Niner, it is unnecessary for the Court to decide whether Dr.

Niner deviated from the applicable standard of care or precisely what acts or omissions constituted a breach of the standard of care. The Court does find, however, that plaintiff has not proven by a preponderance of the evidence that any deviation occurred earlier than February 14, 2001, the date of Taylor's second presentation to Dr. Niner.

All expert medical testimony concerning a deviation by Dr. Niner on September 5, 2000, was based on the assumption that Mr. and Mrs. Taylor complained to Dr. Niner on that date of a specific lump or mass in Taylor's right shoulder area.[6] As noted above, Mrs. Taylor testified that she informed Dr. Niner of the presence of a quarter sized knot on the right shoulder of Taylor which was raised approximately one eighth inch. For several reasons, Mrs. Taylor's testimony is not sufficiently credible to permit the Court to find the necessary factual premises underlying the medical expert opinion. First of all, the apparent conflict between plaintiff's deposition and trial testimony calls into question the accuracy of Mrs. Taylor's trial testimony. Secondly, the competent and credible medical evidence in the record establishes that the knot or mass was likely <u>not</u> present on September 5, or if it was,

---

[6] Dr. Dube did opine that the failure to obtain lab work on February 5 was a deviation from the applicable standard of care. He also testified, however, that renal cell carcinoma would not show up on any blood work or blood studies. Blood in the urine would be common early with this type cancer. When a urine test was completed on June 2, 2001, at a time when the disease was advanced, no blood was found in Taylor's urine.

it was very small and not palpable.[7]  Moreover, Mrs. Taylor's testimony concerning her husband's condition between September 2000 and February 2001 is contradicted by the record and further calls into question her credibility.  Mrs. Taylor testified that her husband's pain was excruciating, affecting his ability to walk, get in and out of a chair, take care of his personal needs and to use his right arm.  Yet the record establishes that Taylor continued to work during this period, made no further appointment with a doctor until February, did not refill or seek refills on any of the short supply of pain medicines given him on September 5, and that Taylor himself reported to his medical doctors that the increased level of pain had begun in February, 2001.  Finally, the notation made by the nurse at LMC on September 5 of Taylor's complaints – "aches all joints" – reflects no complaint of any knot or mass and is consistent with Dr. Niner's testimony on this subject.

Regardless of whether there was a deviation from the standard of care, the plaintiff may only recover if the deviation from the standard of care proximately resulted in Taylor's suffering pain during a short time frame that he would not have

_____

[7]  Dr. Dean McLaughlin testified as follows: "If we looked at the cancer and how big it got over time, there's what's called the doubling factor.  If you go backwards from that and see that, the chances are that the cancer was very small, perhaps maybe a centimeter, maybe a centimeter and a half, so it would be hard for me to understand how there could have been something there, [on September 5, 2003] unless it was in the skin, but it wasn't, it was in the joint . . .  (Transcript, October 4, 2006, p. 240).
          Dr. Dube, plaintiff's expert witness, also testified that was "certainly possible" that the mass in Taylor's right shoulder was "infinitesimally small in February, or very small in February . . ." (Transcript, October 4, 2006, page 39).

otherwise experienced. For the reasons that follow, the Court finds that, even if the Court assumes that Dr. Niner breached the standard of care on September 5 by failing to refer Taylor for further diagnostic testing that could have revealed his cancer, the plaintiff has failed to carry her burden of proving that it was more likely than not that any deviation by Dr. Niner from the applicable standard of care proximately resulted in Taylor's suffering pain and decreased quality of life which he would not otherwise have experienced.

Proximate cause may not be established by testimony which amounts to mere speculation. "[T]he mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinon." *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985). The probable cause of a plaintiff's injury must be shown to be reasonably certain and not a mere likelihood or possibility. *White v. Methodist Hosp. South*, 844 S.W.2d 642, 649 (Tenn. Ct. App. 1992).

The evidence before this Court fails to establish that but for the delayed diagnosis Taylor would have experienced less pain or improved quality of life in the time period in question. As indicated by Dr. McLaughlin, pain can be treated without knowing the underlying cause of the pain. Unfortunately, Taylor presented himself to Dr. Niner on that first visit having already contracted incurable metastatic renal cell

carcinoma. Therefore, all that could be done for Taylor was treatment of his pain. Dr. Niner, while unaware of the cause of Taylor's pain, did treat the pain, and there is no proof before the Court which would establish that Dr. Niner's treatment of the <u>pain</u> was improper, or that an earlier diagnosis would have resulted in a substantially improved quality of life for Taylor. To the contrary, Dr. Niner's prescribed treatments for Taylor's pain were consistent with that of Dr. Aasheim, whose treatment of the plaintiff began only after Taylor's cancer was discovered.

More importantly, Dr. Boys, the radiation oncologist presented by the plaintiff to provide a medical opinion on the issue of causation, failed to establish that causation. Dr. Boys testified that during his treatment of Taylor his pain waxed and waned but that he benefited from treatment. He further testified that he had previously responded to palliative care when Taylor presented to him but he had never gotten complete pain relief. When specifically asked about those medications which had been previously prescribed by Dr. Niner, Dr. Boys indicated that the appropriateness of the medication would depend on the severity of the pain, and that pain management "is as much trial and error as anything." According to Dr. Boys, the pain medication prescribed by Dr. Niner might be adequate for someone with bone metastasis. Dr. McLaughlin testified that even if Taylor had been sent to an oncologist earlier, the oncologist would probably have tried the same type medication initially for the pain

to see what the response was.

When plaintiff's counsel asked Dr. Boys to testify to a reasonable degree of medical certainty that Taylor's quality of life would have improved had there been earlier aggressive treatment, Dr. Boys declined, speaking in terms of speculation and possibility. Dr. Boys stated:

> . . . **Hopefully** they're going to, they're going to get a better outcome. Not everybody responds well regardless of when you diagnose them; but knowing what we know about Mr. Taylor and he did respond, I **guess** it's logical to think that if he had been treated earlier, he **may** have responded at that time also. (emphasis added).

Transcript, October 3, 2006, page 147.

Then, in response to cross-examination about whether Taylor would have had a better quality of life had he received earlier treatment, Dr. Boys responds:

> Well, that answer is strictly based on retrospective knowledge. I knew how he responded. Anytime you get an adequate improvement in quality of life, and that's what I'm basing my response on when I say good response, we don't have an objective scale in, in responding to palliative therapy; but based on how he responded to my therapy, you back the time up, I don't see why he wouldn't have responded then logically; but, again, that's **speculation**. (emphasis added).

*Id.*, page 150. Finally, Dr. Boys stated that "nobody" can say to any reasonable degree of medical certainty that Taylor would have gotten better pain management if his cancer had been diagnosed earlier. *Id.* Dr. McLaughlin also testified that he could

not opine with any degree of medical certainty that Taylor likely wold have obtained better pain control if his cancer had been diagnosed before June 2001. Proof of causation requires expert medical testimony in a medical malpractice case. *Dolan v. Cunningham,* 648 S.W.2d 652, 654 (Tenn. Ct. App. 1983). Dr. Boys offered the only expert medical proof of causation. The record, therefore, does not contain sufficient expert opinion evidence to support a finding of causation since probable cause of an injury cannot be based upon mere likelihood or possibility. *White,* 844 S.W.2d at 649.

For the foregoing reasons, the plaintiff cannot prevail on her claim. A separate judgment in favor of the defendant shall enter.

ENTER:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE